Naomi Spector (SBN 222573)
Email: nspector@kamberlaw.com
**KAMBERLAW, LLP**
1501 San Elijo Road South, Ste.104
San Marcos, CA 92078
Phone: 310.400.1053
Fax: 212.202.6364

Counsel for Plaintiff Lauren Souter, and the putative Classes

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LAUREN SOUTER, individually, and on behalf of others similarly situated,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**EDGEWELL PERSONAL CARE COMPANY, EDGEWELL PERSONAL CARE BRANDS LLC, and EDGEWELL PERSONAL CARE, LLC,**<br><br>**Defendants.** | **CASE NO.**   '20 CV 1486 CAB BLM<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1.  UNFAIR AND UNLAWFUL BUSINESS ACTS AND PRACTICES (CAL. BUS & PROF. CODE §17200 ET SEQ.);**<br>**2.  DECEPTIVE ADVERTISING PRACTICES (CAL. BUS & PROF. CODE §§ 17500, ET SEQ.);**<br>**3.  CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, ET SEQ.);**<br>**4.  BREACH OF EXPRESS WARRANTY; AND**<br>**5.  QUASI-CONTRACT.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Lauren Souter on behalf of herself and others similarly situated, by and through her undersigned counsel, hereby files this Class Action Complaint against Defendants Edgewell Personal Care Company, Edgewell Personal Care Brands, LLC, and Edgewell Personal Care, LLC (collectively "Defendants") and states as follows:

## NATURE OF THE ACTION

1.    This is a case about holding the manufacturers of Wet Ones hand wipes[1] responsible for truthfully and accurately labeling their Products, which are used and relied on by consumers to keep themselves and their families safe from germs.

2.    Specifically, Plaintiff alleges that Defendants' label representations concerning the efficacy and skin safety of the Products are false and misleading, including Defendants' representations that the Products "Kill[] 99.99% of Germs" and that they are hypoallergenic and gentle on skin.  Plaintiff also asserts that Defendants omit critical information concerning the limitations of the Products to "kill germs."

3.    "Germs" is a commonly understood term as an organism that causes disease.

4.    Contrary to Defendants' material representations, however, the Products do not "kill" 99.99% of the organisms that cause disease.

5.    As described in detail herein, the active ingredient in the Products, benzalkonium chloride ("BAC"), is ineffective against non-enveloped viruses, certain gram negative bacteria, and spores.  In addition, the concentration of BAC in the Products and manner of application render the Products ineffective to "kill" certain "germs."

6.    In the absence of truthful disclosures concerning the Products, consumers are falsely led to believe that they are effective—as Defendants' prominently represent—against "99.99% of Germs."  If the Products were accurately labeled, however, consumers would know when they are ineffective and when they should seek alternative hand cleansing methods.

---

[1] Wet Ones wipes are sold in a variety of sizes, scents and variations, including Wet Ones canisters, travel packs, singles and big ones  (collectively, the "Products").  This action includes in the definition of Products all sizes, scents and variations of the Products that bear the "Kills 99.99% of Germs" representation.

**CLASS ACTION COMPLAINT**

7.     Defendants' skin safety representations, including that the Products are "[h]ypoallergenic" and "tough on dirt and germs, yet gentle on skin" are also false and misleading because the Products contain numerous known irritants, allergens and toxins.

8.     BAC, for example, is an established skin irritant and has been found to cause allergic contact dermatitis.

9.     In addition, the third most prevalent inactive ingredient in the Products, phenoxyethanol, is a recognized allergen and toxin.  The United States Food and Drug Administration ("FDA") has stated that phenoxyethanol can depress the central nervous system in infants. A French medical agency cautioned consumers not to use wipes containing phenoxyethanol on children under the age of three because of concerns related to reproductive and developmental toxicity.  The Product directions, however, include use instructions for children 2 years and older.

10.     Plaintiff purchased the Products under the reasonable belief that they were accurately represented, including that the label representations were truthful.  Plaintiff suffered damage, as described herein.

11.     Plaintiff brings this action individually and on behalf of those similarly situated and seeks to represent a Nationwide Class and California Subclass (defined *infra*.).  Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, restitution, equitable relief, and disgorgement of all benefits Defendants have enjoyed from their unlawful and/or deceptive business practices, as detailed herein.  In addition, Plaintiff seeks injunctive relief to stop Defendants' unlawful conduct in the labeling and marketing of the Products.  Plaintiff makes these allegations based on her personal knowledge as to herself and her own acts and observations and, otherwise, on information and belief based on investigation of counsel.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed classes; (2) members of the proposed classes have a different citizenship from

**CLASS ACTION COMPLAINT**

Defendants; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

13.    This Court has personal jurisdiction over Defendants because Defendants' contacts with the forum are continuous and substantial, and Defendants intentionally availed themselves of the markets within California through their sale and distribution of the Products to California consumers and through the privilege of conducting business in California.

14.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants engage in continuous and systematic business activities within the State of California.  Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.  *See also* Declaration of Lauren Souter Regarding Venue Pursuant to Cal. Civ. Code § 1780(d), attached hereto as Exhibit A.

## **PARTIES**

15.    Plaintiff Lauren Souter is a resident of San Diego, California, who purchased the Products during the class period, as described herein.  Plaintiff's claim is typical of all Class members in this regard.  In addition, the advertising and labeling on the package of the Products purchased by Plaintiff, including the Products' label representations, is typical of the advertising, labeling and representation of the Products purchased by members of the Classes.

16.    Defendant Edgewell Personal Care Company is a Missouri corporation with its principal place of business in Shelton, CT.    Defendant and its agents manufacture,  market, distribute, label, promote, advertise and sell the Products. At all times material hereto Defendant was conducting business in the United States, including in California, through its services as a manufacturer and supplier to various stores in California and by, among other things, maintaining agents for the customary transaction of business in California.

17.    Defendant Edgewell Personal Care Brands, LLC is a Delaware Limited Liability Company with its principal place of business  in Shelton, CT.   Defendant and

**CLASS ACTION COMPLAINT**

its agents manufacture, market, distribute, label, promote, advertise and sell the Products. At all times material hereto Defendant was conducting business in the United States, including in California, through its services as a manufacturer and supplier to various stores in California and by, among other things, maintaining agents for the customary transaction of business in California.

18.    Defendant Edgewell Personal Care, LLC is a Delaware Limited Liability Company with its principal place of business in Shelton, CT.    Defendant and its agents manufacture, market, distribute, label, promote, advertise and sell the Products. At all times material hereto Defendant was conducting business in the United States, including in California, through its services as a manufacturer and supplier to various stores in California and by, among other things, maintaining agents for the customary transaction of business in California.

19.    Defendants and their agents promoted, marketed and sold the Products at issue in this jurisdiction and in this judicial district.  The unfair, unlawful, deceptive, and misleading advertising and labeling of the Products was prepared and/or approved by Defendants and their agents, and was disseminated by Defendants and their agents through labeling and advertising containing the misrepresentations and omissions alleged herein.

## **FACTUAL ALLEGATIONS**

### A.    **Defendants Falsely Label and Advertise the Products as Killing 99.99% of Germs**

20.    Defendants manufacture, label, market, promote, advertise, and sell the Products.

21.    The following images depict the front and back panel representations on the Products:

**CLASS ACTION COMPLAINT**



22.    Defendants make numerous false and misleading representations about the ability of the Products to kill germs and clean hands.

23.    Defendants prominently state on the primary display panel that the Products "Kill[] 99.99% of Germs". On the back panel, Defendants state that "Wet Ones® **Antibacterial** Hand Wipes kill 99.99% of germs and wipe away dirt, providing a better clean than hand sanitizers. They are specially formulated to be tough on dirt and germs, yet gentle on skin, so you can confidently keep your hands fresh and clean when soap and water are not available." (Collectively, the "Efficacy Representations").

24.    Under "Directions" Defendants state that "adults and children 2 years and over" should "apply to hands" and "allow skin to dry without wiping".

25.    Defendants' Efficacy Representations are false, deceptive and materially misleading.

26.    Germs" is defined by Merriam-Webster as, among other things, "*especially*: a microorganism causing disease".

27.    The active ingredient in the Products, BAC, does not "kill" certain microorganisms causing disease, which comprise more than .01% of "germs."

28.    In addition, the concentration and formulation of the active ingredient— .13% BAC on a hand wipe—does not "Kill[] 99.99% of Germs".

**CLASS ACTION COMPLAINT**

29.    The directions render the Products additionally ineffective as they state "apply to hands" and "allow skin to dry without wiping."  BAC, however, is slow to act, meaning that it generally must remain on hands for more time than soap and water or an alcohol-based hand sanitizer to "kill germs."  The directions, however, do not ensure that the active ingredient remains on the hands for a sufficient amount of time to denature certain microbes.

30.    Furthermore, the directions do not account for the condition of the hands to which the wipes are applied, which could be dirty, greasy or grimy and prevent adequate application or saturation of the product.

31.    BAC belongs to a group of chemicals called quaternary ammonium compounds ("QAC").

32.    BAC generally works by denaturing the proteins in a cell, including by absorbing or disrupting the cytoplasmic membrane, which causes vital substances to leak out of the cell.  By this mechanism, the cell structure can be compromised, resulting in damage, disruption of essential cell processes and/or cell death.  Accordingly, the outer structure of the microbe to which BAC is applied is critically important to whether BAC will be effective to denature or destroy that microbe.

33.    According to a table published by the Center for Food Security & Public Health regarding the antimicrobial activity of certain disinfectant chemical classes, QAC disinfectants (which includes BAC) demonstrate no activity against: (i) pseudomonads (a type of gram-negative bacteria that are difficult to remove from food preparation surfaces); (ii) chlamydiae (gram-negative bacteria causing infection); (iii) non-enveloped viruses (viruses that lack a lipid bilayer); (iv) parvoviruses (DNA viruses, some of which cause infection in humans, such as "fifth disease"); (v) acid-fast bacteria (a group of bacteria classified by the ability to resist decolorization by acids for staining procedures; for example, M. tuberculosis), (vi) bacterial spores (a dormant form of bacteria; for example, C. difficile, described below), (vii) coccidia (causing infection in dogs), and (viii) prions (proteins with the ability to transmit their misfolded

**CLASS ACTION COMPLAINT**

shape onto other proteins and which are responsible for several fatal neurodegenerative diseases in humans):



The Antimicrobial Spectrum of Disinfectants

34.     Specifically, the structure of non-enveloped viruses, certain gram negative bacteria, and spores render BAC substantially ineffective because BAC cannot readily permeate or disturb the cell membrane and process.

35.     ***Non-enveloped viruses.***  The Products are substantially ineffective at "killing" non-enveloped viruses, including (i) norovirus, (ii) poliovirus, (iii) polyomavirus, (iv) human papillomavirus, and (v) picornavirus.

36.     There are numerous strains or types of each of these groups of non-enveloped viruses, which are responsible for tens of millions of cases of infection in the United States each year.

37.     For example, there are approximately 25 different strains of norovirus that affect humans.  According to the CDC, each year on average in the United States, norovirus causes 19 to 21 million cases of vomiting and diarrhea illness, including

8

2,270,000 outpatient clinic visits (mostly in young children), 465,000 emergency room visits (mostly in young children), 109,000 hospitalizations, and 900 deaths (mostly in adults 65 and older).

38.   According to the CDC, hand washing with soap and water is more effective than hand sanitizing at removing certain kinds of germs, including norovirus. In fact, the CDC's norovirus expert acknowledged that norovirus is resistant to many common disinfectants.  The CDC recommends using bleach to kill norovirus.

39.   In addition, there are more than 100 varieties of HPV, some of which cause common warts on the hands and fingers.  HPV is transmitted primarily through skin-to-skin contact, including by contact with someone who is carrying the virus on their hands or fingers or by touching something that someone else touched who carried HPV on their hands.

40.   BAC is ineffective against HPV.  According to a study published by the American Society for Microbiology titled "A Broad-Spectrum Microbicide with Virucidal Activity against Sexually Transmitted Viruses" BAC does not inactivate non-enveloped papillomaviruses, including HPV.

41.   ***Gram-negative bacteria***. Gram-negative bacteria have a double membrane, often with a strong outer membrane, that is not readily penetrated.  The Products are ineffective against certain gram-negative bacteria, including pseudomonas aeruginosa, and mycobacteria. In addition, the Products have been found to be ineffective or less effective at denaturing the microbes responsible for COVID-19.

42.   Pseudomonas aeruginosa causes infections in the blood, respiratory tract infections like pneumonia, and infections in the body following surgery.  BAC is substantially ineffective against gram-negative bacteria like P. aeruginosa due to the structure of the outer membrane of the microbe, which strictly restricts larger molecules of BAC.

43.   There are more than 190 species of mycobacteria, which are responsible for numerous, serious diseases, including tuberculosis.  BAC is substantially

ineffective against most mycobacteria due to the architecture of the cell wall and lipid content of the bacteria.

44.    In addition, the Products are not listed on the American Chemistry Council's Center for Biocide Chemistries list of approved Products for fighting COVID-19 and it has been noted that they are less effective at "killing" coronavirus than other disinfectants.

45.    According to a scripps.org webpage addressing use of hand sanitizer during the COVID-19 pandemic, "[i]f benzalkonium chloride is listed as an active ingredient, the sanitizer is probably alcohol-free, or does not include a high enough percentage of alcohol to ward off the COVID-19 virus."

46.    According to a study published to the US National Library of Medicine of the National Institutes of Health ("PubMed") in March 2020 titled "Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents," the authors "reviewed the literature on all available information about the persistence of human and veterinary coronaviruses on inanimate surfaces as well as inactivation strategies with biocidal agents used for chemical disinfection, e.g. in healthcare facilities. The analysis of 22 studies reveals that human coronaviruses such as Severe Acute Respiratory Syndrome (SARS) coronavirus, Middle East Respiratory Syndrome (MERS) coronavirus or endemic human coronaviruses (HCoV) can persist on inanimate surfaces like metal, glass or plastic for up to 9 days, but can be efficiently inactivated by surface disinfection procedures with 62-71% ethanol, 0.5% hydrogen peroxide or 0.1% sodium hypochlorite within 1 minute. **Other biocidal agents such as 0.05-0.2% benzalkonium chloride or 0.02% chlorhexidine digluconate are less effective**." (emphasis added).

47.    ***Spores***.  The Products are also ineffective against certain spores that cause disease, such as C. difficile and cryptosporidium

48.    C. difficile is a major spore forming bacteria, which causes between 15-55% of all diarrheas.  C. Difficile have complex layers of spore coats, which render

**CLASS ACTION COMPLAINT**

BAC ineffective against this group of bacteria.

49.    According to the CDC, within a month of diagnosis, 1 in 11 people over the age of 65 died of a healthcare associated C. difficile infection.

50.    In addition, according to a publication from the National Center for Biotechnology Information from the U.S. National Library of Medicine, C. difficile is associated with high morbidity and the cost of C. difficile infections is estimated at $5.4 billion in the United States.

51.    Cryptosporidium is a genus of protozoan pathogens, which include the giardia parasite and the parasite that causes toxoplasmosis. There are at least 16 established cryptosporidium, at least eight of which have been reported in humans.

52.    The pathogen causing toxoplasmosis is commonly found in cat litter and undercooked food and is one of the most common parasitic infections in the world, which may be responsible for approximately 40 million infections in the United States.

53.    Cryptosporidium are responsible for causing gastrointestinal symptoms, including vomiting and diarrhea. Cryptosporidiosis is also the most common cause of recreational water illness outbreaks in the United States. According to the CDC, outbreaks of cryptosporidium increased an average of 13% each year from 2009 to 2017.

54.    Cryptosporidium is protected by an outer shell that makes it very difficult to kill. Cryptosporidium can, for example, survive for many days in chlorinated water in pools and on surfaces disinfected with chlorine bleach.

55.    Accordingly, the microbes against which the Products are ineffective, evaluated alone or collectively, account for more than .01% of "germs" and render Defendants' Efficacy Representations false and misleading.

56.    Furthermore, several studies have noted that BAC may actually increase the incidence of "germs", including because BAC may cause antibacterial resistance in certain microbes.

57.    For example, a 2020 publication titled "Effect of sub-lethal chemical

**CLASS ACTION COMPLAINT**

disinfection on the biofilm forming ability, resistance to antibiotics and expression of virulence genes of Salmonella Enteritidis biofilm-surviving cells" the authors examined "in food environments" bacteria that "can survive and present increased virulence/resistance."  The authors concluded that: "After BAC (Benzalkonium Chloride) and HP (hydrogen peroxide) exposure, biofilm-derived cells presented a down-regulation of rpoS. Exposure to BAC also revealed an up-regulation of invA, avrA and csgD on Salmonella Enteritidis NCTC 13349. The results obtained suggest that biofilm-derived cells that survive disinfection may represent an increased health risk."

58.     Although this action is brought pursuant to consumer protection and common law based on Defendants' false and misleading label representations, and not based on any FDA regulation, by way of background it should be noted that in 2019 the FDA issued a Final Rule wherein it deferred any regulatory action for three consumer antiseptic rub ingredients, including BAC.

59.     The FDA deferred making a monograph or nonmonograph finding for these ingredients and stated that the status would be addressed "after completion and analysis of studies to address the safety and effectiveness data gaps of these ingredients or at another time, if these studies are not completed."[2]  Furthermore, the FDA stated that it was deferring a ruling on whether the ingredients, including BAC, are generally recognized as safe and effective ("GRAS/GRAE").

60.     Accordingly, the Products do not have monograph status, meaning that they are not generally accepted as over-the-counter-drugs and thus are not approved for marketing or labeling under any monograph.  Without approval as over-the-counter-drugs and monograph status, there is no generally accepted FDA language for labeling and marketing the Products.

---

[2] A monograph is described by the FDA as "a kind of 'recipe book' covering acceptable ingredients, doses, formulations, and labeling in over-the-counter drugs.

**CLASS ACTION COMPLAINT**

## B.    Defendants Falsely Label and Advertise the Products as "Hypoallergenic" and "Gentle"

61.    Defendants make numerous false and misleading representations about the hypoallergenic and gentle formulation of the Products.

62.    On the primary display panel, Defendants state that the Products are "Hypoallergenic."  In addition, on the back label, Defendants prominently represent next to an image of a doctor, that the Products are "**Pediatrician Tested**".  Defendants also state that the Products are "specially formulated to be tough on dirt and germs, yet gentle on skin" (collectively, the "Skin Safety Representations" and together with the "Efficacy Representations" the "Representations").

63.    Contrary to the Skin Safety Representations, numerous ingredients in the Products are known allergens or skin irritants.

64.    *BAC*, the active ingredient in the Products, is an established skin irritant.

65.    According to a study, which reviewed Mayo Clinic experience from 2000 to 2012 with patch testing, BAC is increasingly associated with allergic contact dermatitis.  The study states that from 2001 through 2005 and 2006 through 2010, BAC was among the top 10 most frequent allergens in the standard series.

66.    A Swiss study found that 5.5% of people with contact dermatitis were sensitized to BAC.

67.    A study published by the Int J Med Sci., titled "Effect of the Hand Antiseptic Agents Benzalkonium Chloride, Povidone-Iodine, Ethanol, and Chlorhexidine Gluconate on Atopic Dermatitis in NC/Nga Mice," evaluated the effects of BAC on individuals with atopic dermatitis.  The study found that, in a clinical setting involving mice, BAC "induced a significant increase in the severity of the clinical score, infiltration of inflammatory cells, local expression of inflammatory cytokines in subcutaneous tissue, and total serum immunoglobulin."

68.    BAC has also been found to cause adverse health effects, including the triggering of asthma symptoms in people both with and without a history of asthma, and

**CLASS ACTION COMPLAINT**

the triggering of respiratory sensitization and asthma that is attributable to hyperresponsiveness and/or inflammation.

69.    **Phenoxyethanol** is a known toxin, allergen and a suspected carcinogen. Numerous studies demonstrate that phenoxyethanol can cause DNA mutation in animals.

70.    The FDA has stated that phenoxyethanol is "a preservative that is primarily used in cosmetics and medications" and that it can "depress the central nervous system and may cause vomiting and diarrhea" in infants.

71.    In addition, the *French Agence Nationale de Securite du Medicament et des Produits de Sante* has cautioned consumers not to use wipes containing phenoxyethanol on children under the age of three because of health concerns related to "reproductive and developmental toxicity."

72.    The Material Safety Data Sheet (MSDS) on phenoxyethanol states that it can cause skin and lung irritation, and that it may also be toxic to the kidneys, nervous system, and liver, and repeated, long-term exposure can cause organ damage.  The MSDS further states that the toxic effects can occur through inhalation, skin exposure, and ingestion.

73.    According to Hazard Notifications from the Globally Harmonized System of Classification and Labeling of Chemicals (GHS), phenoxyethanol presents a category 2 danger for skin irritation, a category 4 danger for acute oral toxicity if swallowed, and a category 2A danger for causing serious eye damage or eye irritation.

74.    **Caprylyl glycol** is a synthetic skin conditioning agent, preservative and known irritant.

75.    **Dihydroxypropyl peg-5 linoleammonium chloride**.  According to the PubChem Compound Summary, the GHS information provided by 49 companies demonstrated that the compound does not meet GHS hazard criteria by 36 of the 49 companies.  The notifications provided included the warning that the compound causes skin irritation and serious eye irritation.

**CLASS ACTION COMPLAINT**

76.    **_Potassium Sorbate_** is a preservative that can cause allergic reactions and skin irritation in skin care products, particularly where it is applied repeatedly or in high concentration.

77.    **_Disodium EDTA_**, a chemical preservative, has been found to disrupt the surface of skin cells so that other chemicals may penetrate skin more easily.

78.    **_Fragrance_**.  According to the FDA, fragrance is a common allergen found in cosmetic products and can cause allergic contact dermatitis.

79.    Accordingly, Defendants' Skin Safety Representations are false and misleading.

C.    **Plaintiff and Consumers Purchased the Products to Their Detriment**

80.    Plaintiff and consumers purchased the Products to their detriment.

81.    Plaintiff purchased the Products multiple times during the class period in various scents, sizes and configurations, including but not limited to Wet Ones travel packs, singles and canisters, and including in or about March of 2020.  Plaintiff purchased the Products for personal and family use, including for use on her son.  The price paid by Plaintiff was representative of the price paid by similarly situated consumers who purchased the Products.  In addition, the Representations on the Products purchased by Plaintiff were the same as the Representations purchased by members of the Class.

82.    In purchasing the Products, Plaintiff relied on Defendants' Representations, including that the Products "Kill[] 99.99% of Germs" and that they are hypoallergenic and/or gentle on skin.

83.    Defendants knew or should have known that reasonable consumers would consider the Representations material in deciding to purchase the Products. Accordingly, Defendants' Representations are false, misleading and reasonably likely to mislead reasonable consumers.

84.    At the time Plaintiff purchased the Products, Plaintiff did not know, and had no reason to know, that the Representations were misleading, deceptive and

unlawful.  Plaintiff would not have purchased the Products, or would have purchased them on different terms, if she had known the truth.

85.    It is possible, however, that Plaintiff would purchase the Products in the future if the Representations were truthful.

## CLASS DEFINITION AND CLASS ALLEGATIONS

86.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the Classes defined as follows (collectively, the "Class"):

> All citizens of the United States who, within the relevant statute of limitations periods, purchased Defendants' Products ("Nationwide Class");

> All citizens of California who, within four years prior to the filing of the initial Complaint, purchased Defendants' Products ("California Subclass").

87.    Excluded from the Class are: (i) Defendants, their assigns, successors, and legal representatives; (ii) any entities in which Defendants have a controlling interest; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (iv) all persons presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (v) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

88.    Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate sub-classes, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

89.    This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 for the reasons set forth below.

**CLASS ACTION COMPLAINT**

90.    **Numerosity**:  Members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the Nationwide Class consists of millions of purchasers dispersed throughout the United States, and the California Subclass consists of hundreds of thousands of purchasers throughout the State of California.  Accordingly, it would be impracticable to join all members of the Class before the Court.

91.    **Common Questions Predominate:**  There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues.  Included within the common questions of law or fact are:

- Whether the Product Representations and omissions are, or any single representation or omission is, false, misleading and/or deceptive;
- Whether Defendants engaged in unlawful, unfair or deceptive business practices by advertising and selling the Products;
- Whether Defendants violated California Bus. & Prof. Code § 17200, *et seq*.; Cal. Bus. & Prof. Code § 17500, *et seq*.; and/or the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.;
- Whether Defendants committed a breach of express warranty;
- Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;
- Whether Plaintiff and the Class have sustained damage as a result of Defendants' unlawful conduct;
- The proper measure of damages sustained by Plaintiff and the Class; and
- Whether Defendants were unjustly enriched by their unlawful practices.

92.    **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class she seeks to represent because Plaintiff, like the Class members, purchased Defendants' misbranded Products.  Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiff and the Class sustained similar injuries arising

**CLASS ACTION COMPLAINT**

out of Defendants' conduct.  Plaintiff's and Class member's claims arise from the same practices and course of conduct and are based on the same legal theories.

93.  **Adequacy:** Plaintiff is an adequate representative of the Class she seeks to represent because her interests do not conflict with the interests of the members of the Class Plaintiff seeks to represent.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

94.  **Superiority and Substantial Benefit:** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

a.  The claims presented in this case predominate over any questions of law or fact, if any exists at all, affecting any individual member of the Class;

b.  Absent a Class, the members of the Class will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

c.  Given the size of individual Class members' claims, few, if any, members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent members have no substantial interest in individually controlling the prosecution of individual actions;

d.  When the liability of Defendants has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

**CLASS ACTION COMPLAINT**

e.      This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the Class can seek redress for the harm caused to them by Defendants.

95.     Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

96.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

97.     The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are also met as questions of law or fact common to Class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

98.     Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Unfair and Unlawful Business Acts and Practices**
**(Business and Professions Code § 17200, *et seq*.)**
**(*forPlaintiff and the California Subclass*)**

99.     Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

100.    Defendants' conduct constitutes an unfair business act and practice pursuant to California Business & Professions Code §§ 17200, *et seq*. (the "UCL").  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful,

19

unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

101.    Plaintiff brings this claim seeking equitable and injunctive relief to stop Defendants' misconduct, as complained of herein, and to seek restitution of the amounts Defendants acquired through the unfair, unlawful, and fraudulent business practices described herein.

102.    Defendants' knowing conduct, as alleged herein, constitutes an "unfair" and/or "fraudulent" business practice, as set forth in California Business & Professions Code §§ 17200-17208.

103.    Defendants' conduct was and continues to be unfair and fraudulent because, directly or through its agents and employees, Defendants made uniform materially false representations and omissions.

104.    Defendants knowingly and intentionally made the Representations which, as described herein, are false and misleading because the Products do not "kill 99.99% of germs" and are not hypoallergenic and/or gentle on skin.

105.    Defendants also made materially false representations and omissions by failing to disclose the truth about the Products, including that the Products do not denature certain microbes and that they contain ingredients that are known irritants and/or allergens.

106.    Defendants are aware that their Representations and omissions were and continue to be false and misleading.

107.    Defendants had an improper motive—to derive financial gain at the expense of accuracy or truthfulness—in their practices related to the labeling and advertising of the Products.

108.    There were reasonable alternatives available to Defendants to further their legitimate business interests, other than the conduct described herein.

109.    Defendants' misrepresentations of material facts, as set forth herein, also constitute an "unlawful" practice because they violate California Civil Code §§ 1572,

1573, 1709, 1710, 1711, and 1770 and the laws and regulations cited herein, as well as the common law.

110.   Defendants' conduct in making the Representations and omissions described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors.   This conduct engenders an unfair competitive advantage for Defendants, thereby constituting an unfair business practice under California Business & Professions Code §§ 17200-17208.

111.   In addition, Defendants' conduct was, and continues to be, unfair in that their injury to countless purchasers of the Products is substantial, and is not outweighed by any countervailing benefits to consumers or to competitors.

112.   Moreover, Plaintiff and members of the California Subclass could not have reasonably avoided such injury.   Defendants' uniform, material misrepresentations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their misrepresentations and omissions were untrue and misleading. Plaintiff purchased the Products in reliance on the Representations made by Defendants, including that the Product labeling was accurate, and without knowledge of Defendants' misrepresentations and omissions.

113.   Plaintiff and members of the California Subclass have been directly and proximately injured by Defendants' conduct in ways including, but not limited to, the monies paid to Defendants for the Products, interest lost on those monies, and consumers' unwitting support of a business enterprise that promotes deception and undue greed to the detriment of consumers, such as Plaintiff and California Subclass members.

114.   As a result of the business acts and practices described above, Plaintiff and members of the California Subclass, pursuant to § 17203, are entitled to an Order enjoining such future wrongful conduct on the part of Defendants and such other Orders and judgments that may be necessary to disgorge Defendants' ill-gotten gains and to

**CLASS ACTION COMPLAINT**

restore to any person in interest any money paid for the Products as a result of the wrongful conduct of Defendants.

115.    Pursuant to Civil Code § 3287(a), Plaintiff and the California Subclass are further entitled to pre-judgment interest as a direct and proximate result of Defendants' unfair and fraudulent business conduct.  The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the California Subclass are entitled to interest in an amount according to proof.

**SECOND CAUSE OF ACTION**
**Deceptive Advertising Practices**
**(California Business & Professions Code §§ 17500, *et seq.*)**
**(*for Plaintiff and the California Subclass*)**

116.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

117.    California Business & Professions Code § 17500 prohibits "unfair, deceptive, untrue or misleading advertising . . . ."

118.    Defendants violated § 17500 when they represented, through their false and misleading Representations and omissions, that Defendants' Products possessed characteristics and value that they did not actually have.  Defendants knowingly and intentionally made the Representations which, as described herein, are false and misleading because the Products do not "kill[] 99.99% of germs" and are not hypoallergenic and/or gentle on skin.

119.    Defendants also made materially false representations and omissions by failing to disclose the truth about the Products, including that the Products do not denature certain microbes and that they contain ingredients that are known irritants and/or allergens.

120.    Defendants' deceptive practices were designed to induce reasonable consumers like Plaintiff to purchase the Products.  Defendants' uniform, material misrepresentations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their uniform misrepresentations and

22

**CLASS ACTION COMPLAINT**

omissions were untrue and/or misleading.  Plaintiff purchased the Products in reliance on the Representations made by Defendants, including that the Product labeling was accurate, and without knowledge of Defendants' misrepresentations and omissions.

121.   Plaintiff and members of the California Subclass have been directly and proximately injured by Defendants' conduct in ways including, but not limited to, the monies paid to Defendants for the Products, interest lost on those monies, and consumers' unwitting support of a business enterprise that promotes deception and undue greed to the detriment of consumers, such as Plaintiff and Subclass members.

122.   The above acts of Defendants were and are likely to deceive reasonable consumers in violation of § 17500.

123.   In making the statements and omissions alleged herein, Defendants knew or should have known that the statements and representations were untrue or misleading, and acted in violation of § 17500.

124.   Defendants continue to engage in unlawful, unfair and deceptive practices in violation of §17500.

125.   As a direct and proximate result of Defendants' unlawful conduct in violation of § 17500, Plaintiff and members of the California Subclass, pursuant to § 17535, are entitled to an Order of this Court enjoining such future wrongful conduct on the part of Defendants, and requiring Defendants to disclose the true nature of their misrepresentations and omissions.

126.   Plaintiff and members of the California Subclass also request an Order requiring Defendants to disgorge their ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendants by means of such acts of false advertising, plus interests and attorneys' fees.

### THIRD CAUSE OF ACTION
### Consumer Legal Remedies Act
### (Cal. Civ. Code § 1750, *et seq.*)
### (*for Plaintiff and the California Subclass*)

127.   Plaintiff re-alleges and incorporates by reference the allegations contained

**CLASS ACTION COMPLAINT**

in the preceding paragraphs of this complaint, as though fully set forth herein.

128.    Plaintiff brings this action pursuant to California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*.

129.    The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

130.    The Products are "goods," as defined by the CLRA in California Civil Code §1761(a).

131.    Defendants are a "person," as defined by the CLRA in California Civil Code §1761(c).

132.    Plaintiff and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code §1761(d).

133.    Purchase of the Products by Plaintiff and members of the California Subclass are "transactions," as defined by the CLRA in California Civil Code §1761(e).

134.    Defendants violated Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have" in that the Products are falsely and misleadingly labeled and represented, as described herein.

135.    Similarly, Defendants violated section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . if they are of another" by making the Representations and omissions described herein.

136.    In addition, Defendants violated section 1770(a)(9) by advertising the Products "with intent not to sell them as advertised" in that the Products are misrepresented and misbranded as described herein.

137.    Defendants' uniform, material, misrepresentations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their misrepresentations and omissions were untrue and misleading.

138.    Plaintiff and members of the California Subclass could not have reasonably avoided injury.  Plaintiff and members of the California Subclass were unaware of the

existence of facts that Defendants suppressed and failed to disclose and Plaintiff and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

139.   Plaintiff and members of the California Subclass have been directly and proximately injured by Defendants' conduct.  Such injury includes, but is not limited to, the purchase price of the Products and/or the price of the Products at the prices at which they were offered.

140.   Given that Defendants' conduct violated § 1770(a)(5), Plaintiff and members of the California Subclass are entitled to seek and seek injunctive relief to put an end to Defendants' violations of the CLRA.

141.   Moreover, Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers to increase the sale of the Products.

142.   Pursuant to California Civil Code § 1782(a), on March 18, 2020, Plaintiff on her own behalf, and on behalf of members of the California Subclass, notified Defendants of the alleged violations of the Consumer Legal Remedies Act by letter setting forth Plaintiff's claims.  Despite giving Defendants more than 30-days from the date of the notification letter to provide appropriate relief for violations of the CLRA, Defendants have failed to provide any such relief.  As such, Plaintiff also seeks compensatory, monetary and punitive damages, in addition to equitable and injunctive relief, and requests that this Court enter such Orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief as is provided in California Civil Code § 1780 and in the Prayer for Relief.

143.   Plaintiff further requests pursuant to § 1780(a)(2) that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty
**(*for Plaintiff, the Nationwide Class, and California Subclass*)**

144.   Plaintiff re-alleges and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

145.   By advertising and selling the Products at issue, Defendants made promises and affirmations of fact on the Products' packaging and labeling, as described herein. This labeling and advertising constitutes express warranties and became part of the basis of the bargain between Plaintiff and members of the Class, and Defendants.

146.   Defendants, through their advertising and labeling, created express warranties that the Products comport with the Representations.  Specifically, Defendants created express warranties that the Products satisfy the Efficacy and Skin Safety Representations, including that the Products kill 99.99% of germs and are hypoallergenic and/or gentle on skin.

147.    The express warranties appear on all Product labels and specifically relate to the goods being sold.

148.   Despite Defendants' express warranties about the nature of the Products, the Products do not comport with the Representations.  Thus, the Products were and are not what Defendants represented them to be.

149.   Accordingly, Defendants breached express warranties about the Products and their qualities because the Products do not conform to Defendants' affirmations and promises.

150.   Plaintiff provided Defendants with pre-suit notice of the breach of warranty, including by letter dated March 18, 2020.

151.   Plaintiff and members of the Class purchased the Products.

152.   As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products.  Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other general and specific damages including,

**CLASS ACTION COMPLAINT**

but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## QUASI-CONTRACT
### (*for Plaintiff, the Nationwide Class and California Subclass*)

153.   Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

154.   By purchasing the Products, Plaintiff and members of the Class conferred a benefit on Defendants in the form of the purchase price of the Products.

155.   Defendants had knowledge of such benefits.

156.   Defendants appreciated the benefit because, were consumers not to purchase the Products, Defendants would not generate revenue from the sales of the Products.

157.   Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants' fraudulent and misleading Representations and omissions and unlawful conduct.

158.   Equity cannot in good conscience permit Defendants to be economically enriched for such actions at the expense of Plaintiff and members of the Class, and therefore restitution and/or disgorgement of such economic enrichment is required

## **PRAYER**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as follows:

A.   For an order certifying the Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Nationwide Class and California Subclass; and naming Plaintiff's attorneys as Class Counsel to represent the Class and California Subclass;

B.   For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

**CLASS ACTION COMPLAINT**

C.    For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Class for all causes of action;

D.    For an order requiring Defendants to immediately cease and desist from selling their misbranded Products in violation of law; enjoining Defendants from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendants to engage in corrective action;

E.    For an order awarding attorneys' fees and costs;

F.    For an order awarding punitive damages;

G.    For an order awarding pre-and post-judgment interest; and

H.    For such other and further relief as the Court deems just and proper.

DATED:  July 31, 2020                **KAMBERLAW, LLP**

                                    By:  /s/ *Naomi B. Spector*
                                         Naomi B. Spector

                                    *Attorneys for Plaintiff and the putative Classes*