Naomi Spector (SBN 222573)
Email: nspector@kamberlaw.com
**KAMBERLAW, LLP**
1501 San Elijo Road South, Ste.104
San Marcos, CA 92078
Phone: 310.400.1053
Fax: 212.202.6364

Counsel for Plaintiff Lauren Souter, and the
putative Classes

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LAUREN SOUTER, individually, and on behalf of others similarly situated,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**EDGEWELL PERSONAL CARE COMPANY, EDGEWELL PERSONAL CARE BRANDS LLC, and EDGEWELL PERSONAL CARE, LLC,**<br><br>**Defendants.** | **CASE NO. 20-CV-1486 TWR (BLM)**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1.   UNFAIR AND UNLAWFUL BUSINESS ACTS AND PRACTICES (CAL. BUS & PROF. CODE §17200 ET SEQ.);**<br>**2.   DECEPTIVE ADVERTISING PRACTICES (CAL. BUS & PROF. CODE §§ 17500, ET SEQ.);**<br>**3.   CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, ET SEQ.);**<br>**4.   BREACH OF EXPRESS WARRANTY; AND**<br>**5.   QUASI-CONTRACT.**<br><br>**DEMAND FOR JURY TRIAL** |

   Pursuant to Docket Number 62, Plaintiff Lauren Souter on behalf of herself and others similarly situated, by and through her undersigned counsel, hereby files this Second Amended Class Action Complaint against Defendants Edgewell Personal Care

Company, Edgewell Personal Care Brands, LLC, and Edgewell Personal Care, LLC (collectively "Defendants") and states as follows:

## NATURE OF THE ACTION

1.     This is a case about holding the manufacturers of Wet Ones hand wipes[1] responsible for truthfully and accurately labeling their Products, which are used and relied on by consumers to kill germs on their hands.

2.     Defendants' front label representations that the Products "Kill[] 99.99% of Germs" and that they are "Hypoallergenic" are false and misleading.

3.     Defendants also omit critical information concerning the limitations of the ability of the Products to "kill germs" on hands.

4.     "Germs" is a commonly understood term as an organism that causes disease.

5.     Contrary to Defendants' material representation, the Products do not "kill" 99.99% of the organisms that cause disease from the hands of consumers.

6.     The single active ingredient in the Products is benzalkonium chloride ("BAC").

7.     BAC cannot kill numerous germs, including common germs that are transmitted by hand, and are incapable of killing 99.99% of germs on hands.

8.     One independent, public study conducted on the hands of eighth grade students demonstrates that the hand sanitizer brand Soapopular, which also contains BAC as the active ingredient but at a higher concentration than in the Products (0.15% in Soapopular versus 0.13% in the Products), killed only 46% of the germs on the student's hands—a far cry from the 99.99% kill rate touted by Defendants. *See* Exhibit A, CBC News Article, dated December 1, 2009.

---

[1] Wet Ones wipes are sold in a variety of sizes, scents and variations, including Wet Ones canisters, travel packs, singles and big ones  (collectively, the "Products").  This action includes in the definition of Products all sizes, scents and variations of the Products that bear the "Kills 99.99% of Germs" representation and have benzalkonium chloride as the active ingredient.

**SECOND AMENDED CLASS ACTION COMPLAINT**

9.     On information and belief, the Products—which contain BAC on a wipe—are similarly ineffective or even less effective than the Soapopular sanitizer because the Products contain a lower concentration of BAC.

10.     Defendants know that one of the most important, material label representations to consumers is the statement that the Products kill 99.99% of germs.

11.     Defendants make this prominent statement with knowledge that it is false and/or misleading to reasonable consumers.

12.     In addition to the germ-kill representation, Defendants state on the front label of the Products that the Products are "Hypoallergenic."

13.     This Hypoallergenic representation is false and misleading because the Products contain significant allergens and skin irritants.

14.     Plaintiff brings this action individually and on behalf of those similarly situated and seeks to represent a Nationwide Class, excluding Missouri, and a California Subclass (defined *infra*.).   Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, restitution, equitable relief, and disgorgement of all benefits Defendants have enjoyed from their unlawful and/or deceptive business practices, as detailed herein.  In addition, Plaintiff seeks injunctive relief to stop Defendants' unlawful conduct in the labeling and marketing of the Products.  Plaintiff makes these allegations based on her personal knowledge as to herself and her own acts and observations and, otherwise, on information and belief based on investigation of counsel.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed classes; (2) members of the proposed classes have a different state citizenship from Defendants; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

16.     This Court has personal jurisdiction over Defendants because Defendants' contacts with the forum are continuous and substantial, and Defendants intentionally

availed themselves of the markets within California through their sale and distribution of the Products to California consumers and through the privilege of conducting business in California.

17.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants engage in continuous and systematic business activities within the State of California.  Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.  *See also* Declaration of Lauren Souter Regarding Venue Pursuant to Cal. Civ. Code § 1780(d), attached hereto as Exhibit B.

## PARTIES

18.    Plaintiff Lauren Souter is a resident of San Diego, California, who purchased the Products during the class period, as described herein.  Plaintiff's claim is typical of all Class members in this regard.  In addition, the advertising and labeling on the package of the Products purchased by Plaintiff, including the Products' label representations, is typical of the advertising, labeling and representation of the Products purchased by members of the Classes.

19.    Defendant Edgewell Personal Care Company is a Missouri corporation with its principal place of business in Shelton, CT.   Defendant and its agents manufacture,  market, distribute, label, promote, advertise and sell the Products. At all times material hereto Defendant was conducting business in the United States, including in California, through its services as a manufacturer and supplier to various stores in California and by, among other things, maintaining agents for the customary transaction of business in California.

20.    Defendant Edgewell Personal Care Brands, LLC is a Delaware Limited Liability Company with its principal place of business in Shelton, CT.   Defendant and its agents manufacture,  market, distribute, label, promote, advertise and sell the Products. At all times material hereto Defendant was conducting business in the United States, including in California, through its services as a manufacturer and supplier to

**SECOND AMENDED CLASS ACTION COMPLAINT**

1   various stores in California and by, among other things, maintaining agents for the
2   customary transaction of business in California.

3       21.   Defendant Edgewell Personal Care, LLC is a Delaware Limited Liability
4   Company with its principal place of business in Shelton, CT.   Defendant and its
5   agents manufacture, market, distribute, label, promote, advertise and sell the Products.
6   At all times material hereto Defendant was conducting business in the United States,
7   including in California, through its services as a manufacturer and supplier to various
8   stores in California and by, among other things, maintaining agents for the customary
9   transaction of business in California.

10      22.   Defendants and their agents promoted, marketed and sold the Products at
11  issue in this jurisdiction and in this judicial district.   The unfair, unlawful, deceptive, and
12  misleading advertising and labeling of the Products was prepared and/or approved by
13  Defendants and their agents, and was disseminated by Defendants and their agents
14  through labeling and advertising containing the misrepresentations and omissions
15  alleged herein.

16
17                       **FACTUAL ALLEGATIONS**

18  **A.   Defendants Falsely Label the Products as Killing 99.99% of Germs**

19      23.   Defendants manufacture, label, market, promote, advertise, and sell the
20  Products.

21      24.   The following images depict the front and back panel representations on the
22  Products:

23
24
25
26
27
28

**SECOND AMENDED CLASS ACTION COMPLAINT**

 

25.   Defendants falsely represent that the Products kill 99.99% of germs.

26.   Defendants prominently state on the front label of the Products that they "Kill[] 99.99% of Germs" (the "Front Label Representation").   This Front Label Representation is false.

27.   "Germs" is defined by Merriam-Webster as, among other things, "*especially*: a microorganism causing disease".

28.   The active ingredient in the Products, BAC, does not "kill" certain microorganisms causing disease, which comprise significantly more than .01% of "germs" found on hands.

29.   This shortfall in the ability of the Products to kill germs on hands would be material to a reasonable consumer.

30.   The germs that BAC does not kill include numerous common germs found on hands, which account for millions of cases of infection in the United States each year.

31.   Furthermore, under real world conditions (and in contrast to laboratory testing) the Products are additionally ineffective.

**SECOND AMENDED CLASS ACTION COMPLAINT**

32.     BAC is slow to act, meaning that it generally must remain on hands for more time than soap and water or an alcohol-based hand sanitizer to "kill germs."  In many instances, the Product will not remain on hands for a sufficient amount of time for the active ingredient to kill certain germs, including common germs.

33.     Furthermore, hands that are dirty, greasy or grimy prevent adequate application or saturation of the product.

34.     Defendants' back label statements do not clarify or remedy the false Front Label Representation.

35.     On the back panel, Defendants state that "Wet Ones® **Antibacterial** Hand Wipes kill 99.99% of germs and wipe away dirt, providing a better clean than hand sanitizers.  They are specially formulated to be tough on dirt and germs, yet gentle on skin, so you can confidently keep your hands fresh and clean when soap and water are not available." (the "Back Panel Statement" and together with the Front Panel Representation, the "Efficacy Representations").

36.     On information and belief, numerous consumers of Defendants' Products do not view the Back Panel Statement at the time of purchase.

37.     Even if consumers did view the Back Panel Statement, the Statement is additionally false and misleading.

38.     As described herein, the Products do not kill 99.99% of germs and, on information and belief, do not kill more germs than hand sanitizers.

39.     In addition, the statement "so you can confidently keep your hands fresh and clean when soap and water are not available" is false and misleading because the Products are substantially ineffective at killing numerous germs found on hands.

40.     In purchasing the Products, Plaintiff relied on Defendants' Representations.

41.     Among other things, Plaintiff reasonably relied on Defendants' Efficacy Representations for the truth of the matter stated—that the Products kill 99.99% of germs.

42.     To be clear, Plaintiff does not claim that the Products failed to protect her or her family from any specific type of "germ" or organism.

43.     Instead, Plaintiff contends that she reasonably believed that the Products would kill 99.99% of germs from the hands of her and her family. Had she known that the Efficacy Representations were false, she would not have purchased the Products at all, or would have paid less for them.

44.     Plaintiff provides the following information concerning the limitations of the Products to kill certain microorganisms to demonstrate the falsity of Defendants' Efficacy Representations.  This information is not a comprehensive summary of all of the germs that the Products fail to kill, nor does it describe the overall ineffectiveness of the Products when they are applied to hands.  Instead, the information is provided as scientific background concerning how BAC denatures microbes, and to demonstrate why it fails to "kill" certain types of "germs" found on hands that are responsible for disease.

**1.  BAC Is Ineffective Against Numerous Germs**

45.     BAC belongs to a group of chemicals called quaternary ammonium compounds ("QAC").

46.     BAC generally works by denaturing the proteins in a cell, including by absorbing or disrupting the cytoplasmic membrane, which causes vital substances to leak out of the cell.  By this mechanism, the cell structure can be compromised, resulting in damage, disruption of essential cell processes and/or cell death.  Accordingly, the outer structure of the microbe to which BAC is applied is critically important to whether BAC will be effective to denature or destroy that microbe.

47.     According to an information page published by the CDC titled "Hand Hygiene Recommendations Guidance for Healthcare Providers about Hand Hygiene and COVID-19" (updated May 17, 2020), "CDC does not have a recommended alternative to hand rub products with greater than 60% ethanol or 70% isopropanol as active ingredients. Benzalkonium chloride, along with both ethanol and isopropanol, is deemed

**SECOND AMENDED CLASS ACTION COMPLAINT**

eligible by FDA for use in the formulation of healthcare personnel hand rubs.[ 2 ] However, available evidence indicates benzalkonium chloride has less reliable activity against certain bacteria and viruses than either of the alcohols." *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/hand-hygiene.html (footnote omitted).

48.     According to a table published by the Center for Food Security & Public Health regarding the antimicrobial activity of certain disinfectant chemical classes, QAC disinfectants (which includes BAC) demonstrate no activity against: (i) pseudomonads (a type of gram-negative bacteria that are difficult to remove from food preparation surfaces); (ii) chlamydiae (gram-negative bacteria causing infection); (iii) non-enveloped viruses (viruses that lack a lipid bilayer); (iv) parvoviruses (DNA viruses, some of which cause infection in humans, such as "fifth disease"); (v) acid-fast bacteria (a group of bacteria classified by the ability to resist decolorization by acids for staining procedures; for example, M. tuberculosis), (vi) bacterial spores (a dormant form of bacteria; for example, C. difficile, described below), (vii) coccidia (causing infection in dogs), and (viii) prions (proteins with the ability to transmit their misfolded shape onto other proteins and which are responsible for several fatal neurodegenerative diseases in humans).

49.     Specifically, the structure of non-enveloped viruses, certain gram negative bacteria, and spores render BAC substantially ineffective because BAC cannot readily permeate or disturb the cell membrane and process.

50.     ***Non-enveloped viruses.***     The Products are substantially ineffective at "killing" non-enveloped viruses.

51.     There are numerous strains or types of non-enveloped viruses, which are responsible for tens of millions of cases of infection in the United States each year.

52.     For example, there are approximately 25 different strains of norovirus (a common, non-enveloped virus) that affect humans.  According to the CDC, each year on average in the United States, norovirus causes 19 to 21 million cases of vomiting and

diarrhea illness, including 2,270,000 outpatient clinic visits (mostly in young children), 465,000 emergency room visits (mostly in young children), 109,000 hospitalizations, and 900 deaths (mostly in adults 65 and older). *See* https://www.cdc.gov/norovirus/trends-outbreaks/burden-US.html.

53.    Norovirus is commonly found on hands.

54.    According to the CDC, norovirus is "the leading cause of outbreaks from contaminated food in the United States. About 50% of all outbreaks of food-related illness are caused by norovirus." *See* https://www.cdc.gov/norovirus/trends-outbreaks/outbreaks.html (Common Settings of Norovirus Outbreaks).

55.    Most of these outbreaks (at restaurants and catered events) occur in food service settings like restaurants. Infected food workers are frequently the source of outbreaks in food-service settings, often by touching ready-to-eat foods, such as raw fruits and vegetables, with their bare hands before serving them." *Id.*

56.    Wiping hands contaminated with norovirus with the Products will not kill the virus.

57.    According to the CDC, hand washing with soap and water is more effective than hand sanitizing at removing certain kinds of germs, including norovirus.  In fact, the CDC's norovirus expert acknowledged that norovirus is resistant to many common disinfectants.   The CDC recommends using bleach to kill norovirus.   *See* https://www.cdc.gov/norovirus/about/prevention.html.

58.    In addition, there are more than 100 varieties of HPV (another common non-enveloped virus), some of which cause common warts on the hands and fingers. HPV is transmitted primarily through skin-to-skin contact, including by contact with someone who is carrying the virus on their hands or fingers or by touching something that someone else touched who carried HPV on their hands.  *See* Harvard Health Publishing, Harvard Medical School: Human Papilloma Virus (HPV): health.harvard.edu/a_to_z/human-papilloma-virus-hpv-a-to-z, attached as Exhibit C.

59.    "Human papilloma viruses usually are spread by direct skin contact, such

**SECOND AMENDED CLASS ACTION COMPLAINT**

as shaking the hand of someone who has a wart on their finger . . . ." *Id.*

60.  "Health experts estimate that common warts can be found on the hands of about one-fourth of all people in the United States, especially children." *Id.*

61.  BAC is ineffective against HPV.  According to a study published by the American Society for Microbiology titled "A Broad-Spectrum Microbicide with Virucidal Activity against Sexually Transmitted Viruses" BAC does not inactivate non-enveloped papillomaviruses, including HPV.  *See* https://journals.asm.org/doi/full/10.1128/AAC.43.2.314.

62.  ***Gram-negative bacteria***. Gram-negative bacteria have a double membrane, often with a strong outer membrane, that is not readily penetrated.  The Products are ineffective against certain gram-negative bacteria, including pseudomonas aeruginosa, and mycobacteria.

63.  Pseudomonas aeruginosa causes infections in the blood, respiratory tract infections like pneumonia, and infections in the body following surgery.

64.  Pseudomonas infection can be transmitted by hands.  The best way to prevent infection is to wash hands often.  *See* https://www.webmd.com/a-to-z-guides/pseudomonas-infection.

65.  BAC is substantially ineffective against gram-negative bacteria like P. aeruginosa due to the structure of the outer membrane of the microbe, which strictly restricts larger molecules of BAC.

66.  There are more than 190 species of mycobacteria, some of which can be found on and transmitted by hands and which are responsible for numerous, serious diseases, including tuberculosis.  BAC does not effectively kill mycobacteria due to the architecture of the cell wall and lipid content of the bacteria.

67.  ***Coronovirus***.  In addition, the Products do not consistently kill  the microbes responsible for coronaviruses, including the virus responsible for COVID-19.

68.  The Products are not listed on the American Chemistry Council's Center for Biocide Chemistries list of approved Products for fighting COVID-19 and it has been

**SECOND AMENDED CLASS ACTION COMPLAINT**

noted that they are less effective at "killing" coronavirus than other disinfectants.

69.     According to a scripps.org webpage addressing use of hand sanitizer during the COVID-19 pandemic, "[i]f benzalkonium chloride is listed as an active ingredient, the sanitizer is probably alcohol-free, or does not include a high enough percentage of alcohol to ward off the COVID-19 virus." *See* https://www.scripps.org/news_items/6991-handwashing-or-hand-sanitizer.

70.     In addition, according to a study published to the US National Library of Medicine of the National Institutes of Health ("PubMed") in March 2020 titled "Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents," the authors "reviewed the literature on all available information about the persistence of human and veterinary coronaviruses on inanimate surfaces as well as inactivation strategies with biocidal agents used for chemical disinfection, e.g. in healthcare facilities. The analysis of 22 studies reveals that human coronaviruses such as Severe Acute Respiratory Syndrome (SARS) coronavirus, Middle East Respiratory Syndrome (MERS) coronavirus or endemic human coronaviruses (HCoV) can persist on inanimate surfaces like metal, glass or plastic for up to 9 days, but can be efficiently inactivated by surface disinfection procedures with 62-71% ethanol, 0.5% hydrogen peroxide or 0.1% sodium hypochlorite within 1 minute. **Other biocidal agents such as 0.05-0.2% benzalkonium chloride or 0.02% chlorhexidine digluconate are less effective**." (emphasis added).  https://pubmed.ncbi.nlm.nih.gov/32035997/.

71.     The PubMed study examined and found limited efficacy against coronaviruses after exposure to BAC for 10 minutes. *Id.*

72.     By contrast, the Products are designed to be used on hands for mere seconds and well less than a minute.

73.     Accordingly, the Products are ineffective at killing certain coronaviruses on human hands.

74.     ***Spores.***  The Products are also ineffective against certain common spores that cause disease, such as C. difficile and cryptosporidium. These spores are found on

and carried by the human hand.

75.     C. difficile is a major spore forming bacteria, which causes between 15-55% of all diarrheas.  C. Difficile have complex layers of spore coats, which render BAC ineffective against this group of bacteria.

76.     According to the CDC, "If someone with C. diff (or caring for someone with C. diff) doesn't clean their hands with soap and water after using the bathroom, they can spread the germs to everything they touch." *See* https://www.cdc.gov/cdiff/prevent.html#:~:text=diff%20germs%20are%20carried%20 from,germs%20to%20everything%20they%20touch.

77.     Furthermore, "when someone else touches the . . . surfaces that person touched, they can pick up the germs on their hands." *Id.*

78.     Washing with soap and water is the only way to prevent the spread of C. diff. *Id.*

79.     According to the CDC, within a month of diagnosis, 1 in 11 people over the age of 65 died of a healthcare associated C. difficile infection.

80.     In addition, according to a publication from the National Center for Biotechnology Information from the U.S. National Library of Medicine, C. difficile is associated with high morbidity and the cost of C. difficile infections is estimated at $5.4 billion in the United States.

81.     Cryptosporidium is a genus of protozoan pathogens, which include the giardia parasite and the parasite that causes toxoplasmosis.  There are at least 16 established cryptosporidium, at least eight of which have been reported in humans.

82.     The pathogen causing toxoplasmosis is commonly found in cat litter and undercooked food and is one of the most common parasitic infections in the world, which may be responsible for approximately 40 million infections in the United States.

83.     According to the CDC, toxoplasmosis can be transmitted from cats to humans if, for example, a human touches something that has come into contact with a cat feces that contains toxoplasma, including after cleaning a litter box.  *See*

1  https://www.cdc.gov/parasites/toxoplasmosis/epi.html.

2  84.  Cryptosporidium are responsible for causing gastrointestinal symptoms,
3  including vomiting and diarrhea.

4  85.  Cryptosporidium is protected by an outer shell that makes it very difficult
5  to kill.  Cryptosporidium can, for example, survive for many days in chlorinated water
6  in pools and on surfaces disinfected with chlorine bleach.

7  86.  Human hands can be contaminated by cryptosporidium in a number of
8  ways, including by touching surfaces or objects (such as bathroom fixtures or toys) that
9  are contaminated, or by changing diapers or caring for an infected person.  *See*
10  https://www.health.ny.gov/diseases/communicable/cryptosporidiosis/fact_sheet.htm#:~
11  :text=Hands%20can%20become%20contaminated%20in,Contact%20with%20an%20i
12  nfected%20animal.

13  87.  Accordingly, the microbes against which the Products are ineffective, and
14  which are transmitted by human hands, account for significantly more than .01% of
15  "germs" and render Defendants' Efficacy Representations false and misleading.

16  88.  ***Antibacterial Resistance***.  Furthermore, several studies have noted that
17  BAC may actually increase the incidence of "germs", including because BAC may cause
18  antibacterial resistance in certain microbes.

19  89.  For example, a 2020 publication titled "Effect of sub-lethal chemical
20  disinfection on the biofilm forming ability, resistance to antibiotics and expression of
21  virulence genes of Salmonella Enteritidis biofilm-surviving cells" the authors examined
22  "in food environments" bacteria that "can survive and present increased
23  virulence/resistance."  The authors concluded that: "After BAC (Benzalkonium
24  Chloride) and HP (hydrogen peroxide) exposure, biofilm-derived cells presented a
25  down-regulation of rpoS. Exposure to BAC also revealed an up-regulation of invA, avrA
26  and csgD on Salmonella Enteritidis NCTC 13349. The results obtained suggest that
27  biofilm-derived cells that survive disinfection may represent an increased health risk."
28  *See* https://pubmed.ncbi.nlm.nih.gov/31997643/.

**SECOND AMENDED CLASS ACTION COMPLAINT**

### 2. The Manner of Application Renders the Products Additionally Ineffective

90.     The concentration and formulation of the Products render them additionally ineffective at killing germs.

91.     BAC is slow to act against numerous microbes, thus, it must be applied all over and remain on human hands for a substantial period of time in order to kill certain germs.

92.     Moreover, hand sanitizers are tested in an "optimal environment" that "differs greatly from the real-world setting." *See* The Wall Street Journal, dated December 16, 2009, titled "Kills 99.9% of Germs – Under Some Lab Conditions" attached as Exhibit D.

93.     In one test conducted among eighth graders in Hamilton Ontario, "[t]hree popular sanitizers killed between 46% and 60% of microbes on the students' hands, far short of 99.99%." *Id.*

94.     Based on testing conducted by a third party on the hands of eighth grade students using a hand sanitizer containing BAC as its active ingredient (Soapopular hand sanitizer containing 0.15% BAC), the third party found that the hand sanitizer killed merely 46% of the germs on the students' hands. *See* Exhibit A.

95.     On information and belief, the Products—which contain BAC at a lower concentration of 0.13% than the Soapopular brand hand sanitizer used in the study—would be similarly ineffective or even less effective at killing germs on hands. Therefore the prominent Front Label Representation that the Products kill 99.99% of germs is false on its face.

### 3. The Products Have a Non-Monograph Status

96.     Although this action is brought pursuant to consumer protection and common law based on Defendants' false and misleading label representations, and not based on any FDA regulation, by way of background it should be noted that in 2019 the FDA issued a Final Rule wherein it deferred any regulatory action for three consumer antiseptic rub ingredients, including BAC.

97.     The FDA deferred making a monograph or nonmonograph finding for these ingredients and stated that the status would be addressed "after completion and analysis of studies to address the safety and effectiveness data gaps of these ingredients or at another time, if these studies are not completed."[2]  Furthermore, the FDA stated that it was deferring a ruling on whether the ingredients, including BAC, are generally recognized as safe and effective ("GRAS/GRAE").

98.     Accordingly, the Products do not have monograph status, meaning that they are not generally accepted as over-the-counter-drugs and thus are not approved for marketing or labeling under any monograph.  Without approval as over-the-counter-drugs and monograph status, there is no generally accepted FDA language for labeling and marketing the Products.

**B.     Defendants Falsely Label the Products as "Hypoallergenic"**

99.     On the front label, Defendants prominently state that the Products are "Hypoallergenic." (the "Hypoallergenic Representation" and together with the Efficacy Representations, the "Representations").

100.    In addition, on the back label, Defendants prominently represent next to an image of a doctor, that the Products are "**Pediatrician Tested**".  Defendants also state that the Products are "specially formulated to be tough on dirt and germs, yet gentle on skin".  These back label representations reinforce the "Hypoallergenic" statement on the front label.

101.    Dictionary.com defines hypoallergenic as "designed to reduce or minimize the possibility of an allergic response, as by containing relatively few or no potentially irritating substances."

102.    Despite the Hypoallergenic Representation, the Products contain numerous irritating or allergenic ingredients.

---

[2] A monograph is described by the FDA as "a kind of 'recipe book' covering acceptable ingredients, doses, formulations, and labeling in over-the-counter drugs.

**SECOND AMENDED CLASS ACTION COMPLAINT**

103.   Plaintiff does not claim that she or any member of her family suffered an allergic reaction as a result of using the Products.

104.   Instead, Plaintiff contends that, had she known that the Products contained known allergens, skin irritants and toxins, she would not have purchased them, or would have paid less for them.

105.   ***BAC***, the active ingredient in the Products, is an established skin irritant.

106.   According to a study, which reviewed Mayo Clinic experience from 2000 to 2012 with patch testing, BAC is increasingly associated with allergic contact dermatitis. The study states that from 2001 through 2005 and 2006 through 2010, BAC was among the top 10 most frequent allergens in the standard series.

107.   A Swiss study found that 5.5% of people with contact dermatitis were sensitized to BAC.

108.   A study published by the Int J Med Sci., titled "Effect of the Hand Antiseptic Agents Benzalkonium Chloride, Povidone-Iodine, Ethanol, and Chlorhexidine Gluconate on Atopic Dermatitis in NC/Nga Mice," evaluated the effects of BAC on individuals with atopic dermatitis. The study found that, in a clinical setting involving mice, BAC "induced a significant increase in the severity of the clinical score, infiltration of inflammatory cells, local expression of inflammatory cytokines in subcutaneous tissue, and total serum immunoglobulin."

109.   Based on Defendants' Hypoallergenic Representation, Plaintiff and reasonable consumers would not expect that the Products' **active ingredient**—its raison d'être—would be a top 10 most frequent allergen.

110.   ***Phenoxyethanol*** is a known toxin, allergen and a suspected carcinogen, which is found in the Products.

111.   The FDA has stated that phenoxyethanol is "a preservative that is primarily used in cosmetics and medications" and that it can "depress the central nervous system and may cause vomiting and diarrhea" in infants.

**SECOND AMENDED CLASS ACTION COMPLAINT**

112.   In addition, the *French Agence Nationale de Securite du Medicament et des Produits de Sante* has cautioned consumers not to use wipes containing phenoxyethanol on children under the age of three because of health concerns related to "reproductive and developmental toxicity."

113.   The Material Safety Data Sheet (MSDS) on phenoxyethanol states that it can cause skin and lung irritation, and that it may also be toxic to the kidneys, nervous system, and liver, and repeated, long-term exposure can cause organ damage.   The MSDS further states that the toxic effects can occur through inhalation, skin exposure, and ingestion.

114.   According to Hazard Notifications from the Globally Harmonized System of Classification and Labeling of Chemicals (GHS), phenoxyethanol presents a category 2 danger for skin irritation, a category 4 danger for acute oral toxicity if swallowed, and a category 2A danger for causing serious eye damage or eye irritation.

115.   Based on Defendants' Hypoallergenic Representation, Plaintiff and reasonable consumers would not expect that the Products would contain a toxic and known allergen, particularly where the toxic effects can occur through skin exposure.

116.   ***Caprylyl glycol***, an ingredient in the Products, is a synthetic skin conditioning agent, preservative and known irritant.

117.   The following ingredients are also found in the Products:

- ***Dihydroxypropyl peg-5 linoleammonium chloride***.  According to the PubChem Compound Summary, the GHS information provided by 49 companies demonstrated that the compound does not meet GHS hazard criteria by 36 of the 49 companies.  The notifications provided included the warning that the compound causes skin irritation and serious eye irritation.

- ***Potassium Sorbate*** is a preservative that can cause allergic reactions and skin irritation in skin care products, particularly where it is applied repeatedly or in high concentration.

**SECOND AMENDED CLASS ACTION COMPLAINT**

- ***Disodium EDTA***, a chemical preservative, has been found to disrupt the surface of skin cells so that other chemicals may penetrate skin more easily.

- ***Fragrance***.  According to the FDA, fragrance is a common allergen found in cosmetic products and can cause allergic contact dermatitis.

118.  Based on Defendants' Hypoallergenic Representation, Plaintiff and reasonable consumers would not expect that the Products would contain numerous known skin irritants.

119.  If Plaintiff had known that the Hypoallergenic Representation was false and misleading she would not have purchased the Products or would have purchased them on different terms.

**C.   Plaintiff Purchased the Products to Her Detriment**

120.  Plaintiff purchased the Products to her detriment.

121.  Plaintiff purchased the Products multiple times during the class period in various scents, sizes and configurations, including but not limited to Wet Ones travel packs, singles and canisters, and including in or about March of 2020.  Plaintiff purchased the Products for personal and family use, including for use on her son's hands. The price paid by Plaintiff was representative of the price paid by similarly situated consumers who purchased the Products.  In addition, the Representations on the Products purchased by Plaintiff were the same as the Representations purchased by members of the Class.

122.  Plaintiff purchased the Products for the particular purpose of sanitizing hands and killing germs and relied on the Products for this purpose.

123.  In purchasing the Products, Plaintiff relied on Defendants' Representations, including that the Products "Kill[] 99.99% of Germs" and that they are "Hypoallergenic".  Plaintiff reasonably believed the Products would kill 99.99% of germs from hands and are hypoallergenic.

**SECOND AMENDED CLASS ACTION COMPLAINT**

124.   Acting reasonably under the circumstances, Plaintiff relied on Defendants' Representations for the truth of the matter stated.

125.   Had Plaintiff known that Defendants' Representations were false, she would not have purchased the Products or would have purchased them on different terms.

126.   It is possible, however, that Plaintiff would purchase the Products in the future if the Representations were truthful.

### 1.  Reasonable Consumers Rely on Defendants' Representations

127.   According to a "senior brand manager of skin care for Playtex Products Inc, [former] maker of Wet Ones antibacterial wipes" "[t]he 99.99% message is more powerful among consumers than 'antibacterial' or 'germ kill' alone . . . ." *See* The Wall Street Journal dated December 16, 2009 attached as Exhibit D.

128.   On information and belief, Defendants intentionally included the prominent "Kills 99.99% of germs" statement on the front label of the Products to induce purchases and increase sales.

129.   Furthermore, manufacturers are able to charge a price premium for Products that are labeled as natural or hypoallergenic.

130.   On information and belief, Defendants intentionally included the Hypoallergenic Representation on the front label of the Products in order to increase sales and/or charge a premium for the Products.

131.   Defendants knew or should have known that reasonable consumers would consider the Representations material in deciding to purchase the Products.

132.   Defendants knew or should have known that the Representations could plausibly deceive reasonable consumers into believing that the Products kill 99.99% of germs from hands and/or are hypoallergenic.

133.   Reasonable consumers ascribe a common meaning to words on product labels.

134.   Reasonable consumes rely on Product labels for their truth and accuracy.

**SECOND AMENDED CLASS ACTION COMPLAINT**

135.   Reasonable consumers are not required to conduct independent research to determine the truth of label statements.

136.   Reasonable consumers are not expected to look beyond misleading representations on the front label of a product to determine whether they are false.

137.   Instead, it is the responsibility of product manufacturers to accurately label their products in a manner that is not misleading.

138.   Even a perfectly true statement that is couched in a manner that is likely to mislead or deceive consumers is actionable.

139.   Plaintiff and reasonable consumers reasonably believed that the prominent, front label statement that the Products kill 99.99% of germs was true.

140.   Plaintiff and reasonable consumers reasonably believed that the prominent, front label statement that the Products are hypoallergenic was true.

141.   As described herein, Defendants' Representations are literally false.

142.   Accordingly, there is no "common sense" interpretation of the Representations that would overcome their falsity.

143.   At the time Plaintiff and reasonable consumers purchased the Products, Plaintiff and consumers did not know, and had no reason to know, that the Representations were misleading, deceptive and unlawful.   Plaintiff and consumers would not have purchased the Products, or would have purchased them on different terms, if they had known the truth.

## 2. Defendants Profit from their Misconduct

144.   According to Defendants' Product labels, the Products are "America's #1 Hand Wipe*".

145.   Defendants charge a price premium for their Products.

146.   On information and belief, the Products are the #1 selling hand wipe based at least in part on Defendants' label Representations.

147.   On further information and belief, Defendants are able to charge a price premium for their Products based at least in part on Defendants' label Representations.

**SECOND AMENDED CLASS ACTION COMPLAINT**

148.   As alleged herein, if reasonable consumers knew about the falsity of Defendants' Representations, they would not purchase the Products or would pay less for them.

149.   In the last few years, there has been a substantial proliferation in sales of hand hygiene products due to the COVID-19 pandemic.

150.   Defendants' sales of the Products greatly increased during this time.

151.   According to an article from sidneydailynews.com, "[d]ue the increased use of sanitizing wipes amid the pandemic, the [Wet Ones] plant's production began ramping up in January, and then surged in February, going from two shifts working 10 hours a day, four days a week, to nonstop production." *See* https://www.sidneydailynews.com/news/177852/wet-ones-wipes-working-to-meet-demand.

152.   "Usually you can find (Wet Ones) anywhere, but right now it is very hard to find them. Our demand is sky-high right now. We can not keep up. We almost doubled (in production) from where we were in January . . . (Wet Ones is) a very seasonal product. We could see usual spikes (of consumer consumption) in the flu season, but since COVID happened, we have basically been running 24/7. Since the end of January we haven't stopped production." *Id.*

153.   As described herein, Defendants' Products are likely less effective against coronavirus than hand sanitizers containing ethyl alcohol as an active ingredient and are certainly less effective than washing hands with soap and water.

154.   Nevertheless, Defendants profited substantially from the COVID-19 pandemic.

155.   On information and belief, this profit was due in part to Defendants' false and misleading Representations.

## CLASS DEFINITION AND CLASS ALLEGATIONS

156.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others

**SECOND AMENDED CLASS ACTION COMPLAINT**

similarly situated, and as a member of the Classes defined as follows (collectively, the "Class"):

> All citizens of the United States, except for citizens of the State of Missouri, who, within the relevant statute of limitations periods, purchased Defendants' Products ("Nationwide Class");

> All citizens of California who, within four years prior to the filing of the initial Complaint, purchased Defendants' Products ("California Subclass").

157.   Excluded from the Class are: (i) Defendants, their assigns, successors, and legal representatives; (ii) any entities in which Defendants have a controlling interest; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (iv) all persons presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (v) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

158.   Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate sub-classes, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

159.   This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 for the reasons set forth below.

160.   **Numerosity**:  Members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the Nationwide Class consists of millions of purchasers dispersed throughout the United States, and the California Subclass consists of hundreds of thousands of purchasers throughout the State of California.  Accordingly, it would be impracticable to join all members of the Class before the Court.

161.   **Common Questions Predominate:**  There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any

23
**SECOND AMENDED CLASS ACTION COMPLAINT**

individual issues.  Included within the common questions of law or fact are:

- Whether the Product Representations and omissions are, or any single representation or omission is, false, misleading and/or deceptive;
- Whether Defendants engaged in unlawful, unfair or deceptive business practices by advertising and selling the Products;
- Whether Defendants violated California Bus. & Prof. Code § 17200, *et seq.*; Cal. Bus. & Prof. Code § 17500, *et seq.*; and/or the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*;
- Whether Defendants committed a breach of express warranty;
- Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;
- Whether Plaintiff and the Class have sustained damage as a result of Defendants' unlawful conduct;
- The proper measure of damages sustained by Plaintiff and the Class; and
- Whether Defendants were unjustly enriched by their unlawful practices.

162.  **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class she seeks to represent because Plaintiff, like the Class members, purchased Defendants' misbranded Products.  Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiff and the Class sustained similar injuries arising out of Defendants' conduct.  Plaintiff's and Class member's claims arise from the same practices and course of conduct and are based on the same legal theories.

163.  **Adequacy:** Plaintiff is an adequate representative of the Class she seeks to represent because her interests do not conflict with the interests of the members of the Class Plaintiff seeks to represent.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

**SECOND AMENDED CLASS ACTION COMPLAINT**

164. **<u>Superiority and Substantial Benefit</u>**: A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

      a.    The claims presented in this case predominate over any questions of law or fact, if any exists at all, affecting any individual member of the Class;

      b.    Absent a Class, the members of the Class will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

      c.    Given the size of individual Class members' claims, few, if any, members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent members have no substantial interest in individually controlling the prosecution of individual actions;

      d.    When the liability of Defendants has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

      e.    This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the Class can seek redress for the harm caused to them by Defendants.

165. Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

166. The prerequisites to maintaining a class action for injunctive or equitable

**SECOND AMENDED CLASS ACTION COMPLAINT**

relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

167.   The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are also met as questions of law or fact common to Class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

168.   Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Unfair and Unlawful Business Acts and Practices**
**(Business and Professions Code § 17200, *et seq*.)**
***(for Plaintiff and the California Subclass)***

169.   Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

170.   Defendants' conduct constitutes an unfair business act and practice pursuant to California Business & Professions Code §§ 17200, *et seq*. (the "UCL").  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

171.   Plaintiff brings this claim seeking equitable and injunctive relief to stop Defendants' misconduct, as complained of herein, and to seek restitution of the amounts Defendants acquired through the unfair, unlawful, and fraudulent business practices described herein.

172.   Defendants' knowing conduct, as alleged herein, constitutes an "unfair" and/or "fraudulent" business practice, as set forth in California Business & Professions Code §§ 17200-17208.

173.   Defendants' conduct was and continues to be unfair and fraudulent because, directly or through their agents and employees, Defendants made uniform materially false representations and omissions.

174.   Defendants knowingly and intentionally made the Representations which, as described herein, are false and misleading because the Products do not "kill 99.99% of germs" and are not hypoallergenic.

175.   Defendants also made materially false representations and omissions by failing to disclose the truth about the Products, including that the Products do not denature certain microbes and that they contain ingredients that are known irritants and/or allergens.

176.   Defendants are aware that their Representations and omissions were and continue to be false and misleading.

177.   Defendants had an improper motive—to derive financial gain at the expense of accuracy or truthfulness—in their practices related to the labeling and advertising of the Products.

178.   There were reasonable alternatives available to Defendants to further their legitimate business interests, other than the conduct described herein.

179.   Defendants' misrepresentations of material facts, as set forth herein, also constitute an "unlawful" practice because they violate California Civil Code §§ 1572, 1573, 1709, 1710, 1711, and 1770 and the laws and regulations cited herein, as well as the common law.

180.   Defendants' conduct in making the Representations and omissions described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors.  This conduct engenders an unfair competitive advantage for Defendants, thereby constituting an unfair business practice under California Business & Professions Code §§ 17200-17208.

181.   In addition, Defendants' conduct was, and continues to be, unfair in that

27
**SECOND AMENDED CLASS ACTION COMPLAINT**

their injury to countless purchasers of the Products is substantial, and is not outweighed by any countervailing benefits to consumers or to competitors.

182.    Moreover, Plaintiff and members of the California Subclass could not have reasonably avoided such injury.  Defendants' uniform, material misrepresentations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their misrepresentations and omissions were untrue and misleading. Plaintiff purchased the Products in reliance on the Representations made by Defendants, including that the Product labeling was accurate, and without knowledge of Defendants' misrepresentations and omissions.

183.    Plaintiff and members of the California Subclass have been directly and proximately injured by Defendants' conduct in ways including, but not limited to, the monies paid to Defendants for the Products, interest lost on those monies, and consumers' unwitting support of a business enterprise that promotes deception and undue greed to the detriment of consumers, such as Plaintiff and California Subclass members.

184.    As a result of the business acts and practices described above, Plaintiff and members of the California Subclass, pursuant to § 17203, are entitled to an Order enjoining such future wrongful conduct on the part of Defendants and such other Orders and judgments that may be necessary to disgorge Defendants' ill-gotten gains and to restore to any person in interest any money paid for the Products as a result of the wrongful conduct of Defendants.

185.    Pursuant to Civil Code § 3287(a), Plaintiff and the California Subclass are further entitled to pre-judgment interest as a direct and proximate result of Defendants' unfair and fraudulent business conduct.  The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the California Subclass are entitled to interest in an amount according to proof.

**SECOND AMENDED CLASS ACTION COMPLAINT**

## SECOND CAUSE OF ACTION
### Deceptive Advertising Practices
### (California Business & Professions Code §§ 17500, *et seq.*)
### (*for Plaintiff and the California Subclass*)

186. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

187. California Business & Professions Code § 17500 prohibits "unfair, deceptive, untrue or misleading advertising . . . ."

188. Defendants violated § 17500 when they represented, through their false and misleading Representations and omissions, that Defendants' Products possessed characteristics and value that they did not actually have. Defendants knowingly and intentionally made the Representations which, as described herein, are false and misleading because the Products do not "kill[] 99.99% of germs" and are not hypoallergenic.

189. Defendants also made materially false representations and omissions by failing to disclose the truth about the Products, including that the Products do not denature certain microbes and that they contain ingredients that are known irritants and/or allergens.

190. Defendants' deceptive practices were designed to induce reasonable consumers like Plaintiff to purchase the Products. Defendants' uniform, material misrepresentations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their uniform misrepresentations and omissions were untrue and/or misleading. Plaintiff purchased the Products in reliance on the Representations made by Defendants, including that the Product labeling was accurate, and without knowledge of Defendants' misrepresentations and omissions.

191. Plaintiff and members of the California Subclass have been directly and proximately injured by Defendants' conduct in ways including, but not limited to, the monies paid to Defendants for the Products, interest lost on those monies, and consumers' unwitting support of a business enterprise that promotes deception and

undue greed to the detriment of consumers, such as Plaintiff and Subclass members.

192.   The above acts of Defendants were and are likely to deceive reasonable consumers in violation of § 17500.

193.   In making the statements and omissions alleged herein, Defendants knew or should have known that the statements and representations were untrue or misleading, and acted in violation of § 17500.

194.   Defendants continue to engage in unlawful, unfair and deceptive practices in violation of §17500.

195.   As a direct and proximate result of Defendants' unlawful conduct in violation of § 17500, Plaintiff and members of the California Subclass, pursuant to § 17535, are entitled to an Order of this Court enjoining such future wrongful conduct on the part of Defendants, and requiring Defendants to disclose the true nature of their misrepresentations and omissions.

196.   Plaintiff and members of the California Subclass also request an Order requiring Defendants to disgorge their ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendants by means of such acts of false advertising, plus interests and attorneys' fees.

**THIRD CAUSE OF ACTION**
**Consumer Legal Remedies Act**
**(Cal. Civ. Code § 1750, *et seq.*)**
**(*for Plaintiff and the California Subclass*)**

197.   Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

198.   Plaintiff brings this action pursuant to California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*.

199.   The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

30

200. The Products are "goods," as defined by the CLRA in California Civil Code §1761(a).

201. Defendants are a "person," as defined by the CLRA in California Civil Code §1761(c).

202. Plaintiff and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code §1761(d).

203. Purchase of the Products by Plaintiff and members of the California Subclass are "transactions," as defined by the CLRA in California Civil Code §1761(e).

204. Defendants violated Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have" in that the Products are falsely and misleadingly labeled and represented, as described herein.

205. Similarly, Defendants violated section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . if they are of another" by making the Representations and omissions described herein.

206. In addition, Defendants violated section 1770(a)(9) by advertising the Products "with intent not to sell them as advertised" in that the Products are misrepresented and misbranded as described herein.

207. Defendants' uniform, material, misrepresentations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their misrepresentations and omissions were untrue and misleading.

208. Plaintiff and members of the California Subclass could not have reasonably avoided injury. Plaintiff and members of the California Subclass were unaware of the existence of facts that Defendants suppressed and failed to disclose and Plaintiff and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

209. Plaintiff and members of the California Subclass have been directly and proximately injured by Defendants' conduct. Such injury includes, but is not limited to, the purchase price of the Products and/or the price of the Products at the prices at which

they were offered.

210.   Given that Defendants' conduct violated § 1770(a)(5), Plaintiff and members of the California Subclass are entitled to seek and seek injunctive relief to put an end to Defendants' violations of the CLRA.

211.   Moreover, Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers to increase the sale of the Products.

212.   Pursuant to California Civil Code § 1782(a), on March 18, 2020, Plaintiff on her own behalf, and on behalf of members of the California Subclass, notified Defendants of the alleged violations of the Consumer Legal Remedies Act by letter setting forth Plaintiff's claims.   Despite giving Defendants more than 30-days from the date of the notification letter to provide appropriate relief for violations of the CLRA, Defendants have failed to provide any such relief.   As such, Plaintiff also seeks compensatory, monetary and punitive damages, in addition to equitable and injunctive relief, and requests that this Court enter such Orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief as is provided in California Civil Code § 1780 and in the Prayer for Relief.

213.   Plaintiff further requests pursuant to § 1780(a)(2) that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein.

**FOURTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(*for Plaintiff, the Nationwide Class, and California Subclass*)**

214.   Plaintiff re-alleges and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

215.   By advertising and selling the Products at issue, Defendants made promises and affirmations of fact on the Products' packaging and labeling, as described herein.

**SECOND AMENDED CLASS ACTION COMPLAINT**

This labeling and advertising constitutes express warranties and became part of the basis of the bargain between Plaintiff and members of the Class, and Defendants.

216.   Defendants, through their advertising and labeling, created express warranties that the Products comport with the Representations.  Specifically, Defendants created express warranties that the Products satisfy the Efficacy and Hypoallergenic Representations, including that the Products kill 99.99% of germs and are hypoallergenic.

217.   The express warranties appear on all Product labels and specifically relate to the goods being sold.

218.   Despite Defendants' express warranties about the nature of the Products, the Products do not comport with the Representations.  Thus, the Products were and are not what Defendants represented them to be.

219.   Accordingly, Defendants breached express warranties about the Products and their qualities because the Products do not conform to Defendants' affirmations and promises.

220.   Plaintiff provided Defendants with pre-suit notice of the breach of warranty, including by letter dated March 18, 2020.

221.   Plaintiff and members of the Class purchased the Products.

222.   As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products.  Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other general and specific damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## QUASI-CONTRACT
### (for Plaintiff, the Nationwide Class and California Subclass)

223.   Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

SECOND AMENDED CLASS ACTION COMPLAINT

224.   By purchasing the Products, Plaintiff and members of the Class conferred a benefit on Defendants in the form of the purchase price of the Products.

225.   Defendants had knowledge of such benefits.

226.   Defendants appreciated the benefit because, were consumers not to purchase the Products, Defendants would not generate revenue from the sales of the Products.

227.   Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants' fraudulent and misleading Representations and omissions and unlawful conduct.

228.   Equity cannot in good conscience permit Defendants to be economically enriched for such actions at the expense of Plaintiff and members of the Class, and therefore restitution and/or disgorgement of such economic enrichment is required

## **PRAYER**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as follows:

A.   For an order certifying the Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Nationwide Class and California Subclass; and naming Plaintiff's attorneys as Class Counsel to represent the Nationwide Class and California Subclass;

B.   For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

C.   For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Class for all causes of action;

D.   For an order requiring Defendants to immediately cease and desist from selling their misbranded Products in violation of law; enjoining Defendants from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendants to engage in corrective action;

E.   For an order awarding attorneys' fees and costs;

**SECOND AMENDED CLASS ACTION COMPLAINT**

F.      For an order awarding punitive damages;

G.      For an order awarding pre-and post-judgment interest; and

H.      For such other and further relief as the Court deems just and proper.

DATED:  March 18, 2022                    **KAMBERLAW, LLP**

By:  /s/ Naomi B. Spector
       Naomi B. Spector, Esq.

*Attorneys for Plaintiff and the putative Classes*

**SECOND AMENDED CLASS ACTION COMPLAINT**